2024-2160. Dr. Ogden. Thank you, Your Honor. May it please the Court. Here, the District Court erred by imposing a requirement for an express definition or a numerical definition that banished any uncertainty. Yet even in the presence of an express and numeric definition, the District Court still found antimicrobial amount indefinite. And then the District Court further erred with respect to both antimicrobial amount and about by sui sponte identifying experimental results and conducting its own scientific analysis to find indefiniteness without giving the parties a fair opportunity to submit expert testimony or brief the issue. Well, let's talk about about. Yes, Your Honor. Because if we affirm on either one of these grounds, you lose. I would agree. The prior office is 7.0. And the claim is now 7.6 to 10. If there wasn't this prior off, maybe the question of about wouldn't be so significant. But here, you've got close prior off. And in fact, you look at the specification, it reads from 5 to 9. So you've been backtracking. So it sure looks that in context here, about is indefinite. Well, Your Honor, I would think that all you need to do is go to the intrinsic record. There's really no extrinsic evidence on this that the Court relied on. And so I think first, just to quickly start with the examples, because I think this was the biggest issue. The examples kind of came out of nowhere, because the other side said the examples don't tell you anything. And the judge felt that they tell you quite a bit. And so I think if you look at Appendix 39, that's where the District Court analyzed the examples and concluded there are two positions. It's either up to about . . . up to .3 or up to .5. Those deviations are permitted under about. Now, how did it get there? It started in the right place. It said there are examples that report instances in which the applicant set a target pH, measured the pH, and then decided to proceed even though the pH was not at the exact target level. And it even called these experiments guideposts. That's at Appendix 37. Now, the error here was that when they didn't mention altering, the Court decided that must mean . . . that silence must mean that it was acceptable. And the Court said that exactly at Appendix 39. But what it should have been looking at was what it's . . . the starting point it gave was, what was the threshold for an alteration, no alteration decision? And that's clear in the examples. And I'd just like to look at one example, 18. I think it's the best one. It starts at Column 43 of the patent. And here you have an experiment. It's got two targets, pH 6 and pH 9. So after they prepare this water that has this acid in it, but before they put the chicken in, they say, let's measure the pH. It's 9.3 for both of these bins. And what do they do? For the one that they're going to target 6, they alter it. And it goes down. For 9.3, which is the target of 9, they leave it. So that's a .3 deviation that's acceptable. Okay? Then this experiment goes on and is commensurate with the claims. They then add the chicken. And what do they do? They measure. And they find there that in the bin of 6, it was 6.7. They adjust down. So now we know .7 is not acceptable. For 9, it's 8.6. It's .42 low. So we know .4 is not acceptable because they adjust. So in one experiment where they followed along as it is in the claims, we see that an adjustment of .3, a deviation of .3 is acceptable, but a deviation of .4 is not. And if you look at the rest of the examples where they actually talk about measuring and altering, you'll see that there's never a deviation where they alter that is below .3. And that example, but there are plenty of examples in the specification, even the discussion of this one experiment that seems to dwarf the others because it was like 6,000 chickens. And in a number of those, we're clearly talking about 3 to 5, 3.35 to .5, right? I mean, you're not – I don't think there was a dispute that there's stuff in the spec that clearly goes beyond less than .3, right? I dispute that there was ever a decision made to alter or not alter that would be informative of how the skilled artisan looked at it. That's not my question. Can you just answer my question? They are measured deviations at some course in these experiments, yes, that are more than .3. And it seemed to me that your legal argument or your argument was, well, the majority of the examples are at less than .3, so you shouldn't consider the minority, the great minority – what happened with the minority of examples. Is that – There's two legal arguments here. Number one is that the district court got it wrong when it says that these measured deviations were somehow acceptable, because it went and analyzed for the very first time this evidence with no input or no argument, and this was never addressed by any of the parties or an expert. And that goes to the second legal argument, which is because of that, we never had an opportunity to address it. And so we didn't have a chance to even talk about it. Well, I'm mistaken. Like, I think I saw it. It's in blue. But in 6, you say the great majority – you quote the judge as saying the great majority of the time, the specification provides a deviation of .3. Pretty clear is all that is required for reasonable certainty. By allowing the remaining evidence, the great minority of the time, to negate that inference, the district court required absolute certainty and precision. So I thought, and you'll go on to say, the district court rigidly required a precise functional limit or numerical limit to the term about, defeating the very purpose of the term. So I thought we were all operating under the same plane, which is the majority of the times, the examples in the spec may, in fact, be .3 or less, but there's a significant minority of examples in the spec that go beyond that. Right. And that you say that as a matter of law, the district court should have gone with the majority and ignored the minority for purposes of indefinite situations. Well, that's one part of our argument, but it's a little more nuanced than that. And I apologize if it wasn't clear. But, for example, if you look at our – So I would agree that that's not a good legal argument, because it can be indefinite – that's almost what makes something indefinite is if you have some, even if the majority of things say one thing, but there is a minority that says something else. That's what makes something indefinite, does it not? It can. It can. But in this situation, these deviations that the judge identified, these are just deviations in a measurement. They have nothing to do with the decision of altering or not altering. And so one of the things that Skilled Arson also would have looked at is the prosecution history. The original claims only involved providing the water at that pH. So there was an initial measurement, and then they look and said, where is it? And they get it to 9, and then they just go. And they don't do this second alteration after adding the chicken. So if you look at all the examples, except for example 24 – so example 16, 17, 18, 19 – Where are you in the record? I'll have to give you appendix sites. We can start with 16, if you'd like, which is going to be an appendix 87. But you'll find in each of these that when they're talking about preparing the water, Your Honor, they discuss, we made up a batch of this parasitic acid-containing water, we measured the pH, and then we either altered it or we didn't to get it to the pH that we wanted. So I talked about 18. Oh, I'm sorry. I was confused because I thought you had moved on to the prosecution history. I apologize. No, I'm talking about all the examples. Okay. You're talking about the specification, not the prosecution history. Yes, Your Honor. So examples 1-14 are not relevant. Examples 16, 17, 18, 19, 22, and 23, these are the ones that involve discussions of pH. And then there's 24. So set aside 24 for just a second, and I'll talk about that. In all of these, at the beginning of the experiment, they make up the water, they measure it, and then they'd make a decision, am I going to alter the pH or not before I add the chicken? Some of them, like example 18, they even do that other altering step thereafter. 24, all they do is say, we're going to run this at this certain pH and try to maintain it. And this is another kind of interesting aspect of the science. The Court says this is the most instructive example. This was a proof of principle on a large scale in a little control. These birds were in there for 18 hours straight. And so, yeah, 18 hours. And so what happens, 16 hours, I believe. And so what happens there is they're just measuring once, sometime in the day, to see, are we at this pH that's going to show us this weight gain? And they just look at that as an average pH for this big proof of principle that they're putting on to the people who are going to purchase this, you know, from them later on. So is the argument now that anything that deviated from the .3 in the specification, there's nothing that deviated from it because there's other reasons to explain that deviation? Is that what you're saying? Yeah. And that's not a new argument. For example, at our opening brief at 25 to 26, I think the way I articulated it just now may be a little different. But we said there that these deviations greater than .3 is an unsupported inference from the data. At our opening brief at 33, we say there is no evidence these nine examples would have confused a skilled artisan. We also discussed this at our reply at three, the district court made its own erroneous factual determinations as to what pH deviations were permissible and which examples were most instructive. And so this was the problem. The district court did this all on its own. And so nobody ever had a chance to address this. And after 11 years searching for, to get the patent allowed, EnviroTech has the right to marshal the best available rebuttal evidence to ensure that the district court reaches a scientifically accurate decision. And it was denied that opportunity here. If you're ready for your rebuttal, you can continue or save it. I will save it. Thank you, Your Honor. Ms. McComas. May it please the Court. Debbie McComas on behalf of Safe Foods. I'll jump right into about, as Judge Lori, as you pointed out, my friend has to overcome both terms, improve both. The district court erred in finding both of them indefinite in order to get relief from this Court. I submit they can't achieve that on either of the claim terms. So I'm going to start with about, since that's where the Court started and where the questioning rested. Judge Prost, as you mentioned, their teaching in the specification to go clearly beyond .3, that was 5.8 million birds instead of 6,000. So if that was what you meant, 6 million, but go ahead. Right. And the point there was not to correct you, but to point out one of the reasons the district court honed in on that example was because it was such a large example and the numbers were so disparate. And what about the argument made on appeal that the district, what your friend articulated here, that the district court was wrong in construing those other examples as indicating that it was anything more than .3? I disagree. And I also disagree with the argument that this was not raised, the significance of the examples was not raised below. I agree it was not raised by EnviroTech. But Safe Foods had pages in Dr. Mill's declaration that walked through every single one of these examples and explained why they didn't give adequate explanation for one skilled in the art. And although the district court did not cite to any of that evidence, there's overlap between what's being explained there and what the district court found. But what the district court found based on the specification is it simply doesn't give us the guidance we need to understand what about means because those results are all over the place. They run at least in the largest example, which the district court found to be the most significant, between .35 and .5. I do want to double down a little bit also on the argument that EnviroTech didn't have the ability to raise this because it didn't know. Repeatedly in all of our briefs, we all understand that claim construction is the specification, the claims, and the prosecution history. The reason why EnviroTech didn't double down on the examples and address those examples is because they were steering the court and the parties away from that. They wanted a plain and ordinary meaning, approximate. You see that interlaced in the briefing here, too. And that's why they didn't want to embrace those examples. Well, looking at the page 37 to 39 where the district court quite effectively lays out the examples concisely, was this all the first time, was this the first time people were talking about these examples in the spec? No. That's my point, is for EnviroTech, probably. For Safe Foods, if you look at the page, I'm going to get you to the right page quickly. There's an entire discussion, I believe it's 2525. Oh, it begins at 2523. That's volume two? Yes, ma'am. Paragraph 32. And it runs to 2525. There's substantial discussion and it's referenced in the briefing, I believe that's 1960, referring back to this part of the declaration. So we raised problems with the examples. We discussed the problems with the examples and why they didn't help with the claim construction analysis. Keep in mind, we're not really fighting at that point against a .3, which I'm not sure even standing here today EnviroTech really wants to embrace. Right? That was not the issue. The question was plain and ordinary meaning versus indefiniteness. I can't understand anything here. So we did address the examples and say the examples don't help you. Do you want to get to antimicrobial? I do, Your Honor. Thank you. With respect to antimicrobial, I think there are problems here, too. Antimicrobial, I think everyone agrees, is a functional claim. And when it's functional, it's not enough to tell me what it is. You have to tell me what it does. And you have to tell me how what I'm doing as a potential... No, what it does is inhibit the growth of the microbe. But, of course, there are different kinds of microbes. And some may be inhibited and some may not be. And they might be at different doses. But the function is clear. Well, the function is clear. But what the case law tells us consistently, whether we're talking about Navarro or Halliburton, is that you also have to tell me how do I get there? What's my result? And the language is helpful from, I actually wrote this one down, when a multiplicity of factors might lead one skilled in the art to apply a different test, or I think what applies to this case, or arrive at different results related to the functional claim, the term is indefinite. So the results here, the problem, what we're missing is what percentage reduction counts as antimicrobial. And that's what this patent doesn't tell us. That is what we're missing. We do not know what result is going to be, is going to fit antimicrobial under this definition. Well, within the skill of the art to determine whether a particular substance is effective against a particular microbe. Isn't that very basic? I think at a basic level, that's true. But I think here you have an invention that is telling me in the context of applying a certain amount of PPM, I have to achieve what the invention is claiming to be the antimicrobial amount. And at this point, that's why the specification matters and why the district court's focus on the specification does matter. Because what that tells us is it's going to be more than just any reduction. More than what? Any reduction. Any reduction. It can't just be it reduces it, and therefore we're good. Because the examples that we're looking at show levels of reduction where they found it was not effective. They have examples where they show it was at the ten level where it was zero, and then it increased and they found that not effective. So that's what the district court was focusing on when it looked at the test results. We also have to complement that, the expert testimony that the district court noted in the footnote, which shows the one size does not fit all. As Your Honor alluded to, clearly, whether you're talking about different types of bacteria, different types of microbes, whether you have dirty chickens, whether you're taking into account other factors, impact how that is done is going to be important in what the result would be. So maybe to put it in an easier context, I can take the same PPM in multiple tests, same PPM of PAA in multiple tests, and the factors and circumstances are different. And the results of a reduction will be different. So that's the piece of this formula that we are missing in this context. I would point out in our briefing, we did note that the prosecution history here, there was an argument made about the prosecution history, and there was a distancing from any suggestion that reduction, any reduction, even of like .00001 would suffice under this, is disclaimed by distinguishing Hilgren. If the Court has no further questions. Thank you, Your Honors. Thank you, Your Honors. I just want to start with antimicrobial amount, and I want to say I disagree with the scientific analysis that was set forth in that the patent has an express definition that you keyed in on, it's to reduce. And actually what I heard was there are examples where there wasn't an effective, wasn't efficacy. But that's not what any of those experiments say. In fact, the amounts used in every one of the experiments was effective. There is nowhere in the patent where they say this is not effective. They say sometimes it's less effective, which means it's still effective. And so the district court concluded there had to be a numeric amount put around this reduction. That's wrong here, and the reason is for exactly what my friend stated. The conditions are different depending on what you're doing, different plants, and one's fill-in-the-art understands that. So they understand how to know if they got a reduction. There's no argument there wasn't a test to measure that here. It's very clear. And so I think what needed to happen here was to look at it from the express definition, which itself is binary, which is anything greater than zero, a numeric amount. And so if you look through the examples yourself, you'll see that they were always found to be effective, maybe less effective or not as effective within one minute as 30 minutes later. So unless you have questions on antimicrobial amount, I just wanted to address what was stated about, about. And the first thing I'd like to say is that at Appendix 41, there was no extrinsic evidence on this. So on that discussion, the district court said neither party presented extrinsic evidence on a facetious understanding. And that's correct. If you look at the paragraphs that my friend over here cited, all that Dr. Mills did in those was say, I don't like this experiment because they didn't look at other microbes. I don't like this experiment because they measured the bacteria in the water instead of the chicken. But there's never going to be a perfect experiment. That's why scientists do it. And if you read through the examples, it's just like a scientist would. They start and look at variables and keep moving them down. And so I don't think it's correct that there was any evidence from either side. We had no reason to rebut anything from their expert, because all they did was criticize the examples. They never made the point that they were somehow confusing. It was the district court for the first time that then raised that issue, and we never had a chance to address it. I also wanted to comment on the 5.8 million bird example. I talked about that a little bit before. It's not commensurate with the scope of the claims at issue that alter the pH. Because, again, as I said, if you read the example, all they do is say we got the water up to the pH we wanted and we added the birds. And then they measure it at some time during that 16-hour period of each day. They do say we maintain the pH, but they don't say how they did that, when they did that. So they could have altered right after they made those measurements. It's just silent. And silence should not be enough to render a patent indefinite and take away the patent rights that have been earned by the patentee. And then for the last thing I wanted to discuss was just the prosecution disclaimer. So I think if there was a question in the court's mind, since it already said it's either .3 or it's .5, that was resolved by prosecution disclaimer. And, in fact, the court says it out loud at Appendix 39, footnote 137. If about 7.3 would not have overlapped with the prior art, then it's fair to expect that EnviroTech would have said as much instead of immediately surrendering claims scope. Wasn't that argument waived? Forfeited? I do not believe that that argument is waived. So first off, if we're talking about waiver, bringing that to you, anything that is based on the district court's interpretation of the intrinsic evidence, that's a matter of law. And so we can raise that here. And I will also note that my co-counsel from EnviroTech stated that it was less than or equal to .3. That's at Appendix 3429 to 3431 in that colloquy that happened, where he kind of realized halfway through, we're no longer talking about claim construction. Now we're talking about indefiniteness. And he says, oh, I'm tracking with you now, Your Honor. Yes. Counsel, you are about out of time, and that is not indefinite. Okay. Thank you. Thank you very much. Thank you so much. The case is submitted.